Alfonso WALDEN, Plaintiff

v.

**SAINT GOBAIN CORPORATION**
and Glotel, Inc., Defendants

No. Civ.A.03–4768.

United States District Court,
E.D. Pennsylvania.

June 30, 2004.

Sidney L. Gold, Krystn E. Mundy, Traci M. Greenberg, Sidney L. Gold & Associates, PC, Philadelphia, PA, for Plaintiff.

Joseph A. Hirsch, Hirsch and Hirsch, Bala Cynwyd, PA, for Defendants.

## MEMORANDUM OPINION AND ORDER

RUFE, District Judge.

Plaintiff Alfonso Walden brings this action against Defendants Saint Gobain Corporation ("Saint Gobain") and Glotel, Inc. ("Glotel"), alleging race-based employment discrimination, promissory estoppel and fraudulent misrepresentation. Near the outset of this litigation and with the express consent of all parties, the Court stayed Walden's claims against Glotel pending the outcome of arbitration proceedings and permitted the case to move forward solely as to Walden's claims against Saint Gobain.[1] Presently before the Court is Saint Gobain's Motion for Summary Judgment. For the reasons below, Saint Gobain's Motion is granted as to all counts in the Complaint.

## BACKGROUND

Saint Gobain, a building materials supplier, retained Glotel to locate and recruit computer network programmers and consultants to work at Saint Gobain's North American headquarters. Sometime in early 2002, Lynne Watson of Glotel contacted Walden, an African American male, and informed him of an open position with a company located near West Chester, Pennsylvania. At the time, Walden was working for the City of Philadelphia as an employee of a City subcontractor, Ajilon, with a salary of $67,000 per annum. Knowing that Ajilon's contract with the City was about to expire and therefore his job at the City was going to end shortly,

---

1. Court Order of 11/5/03 [Doc. # 8].

Walden authorized Watson to send his resume to the company in hopes of obtaining a new job.[2]

In late February 2002, Walden met with Steve Hillman of Glotel, who provided details about the position, then revealed to be with Saint Gobain. Soon thereafter, Walden interviewed for the position with Lee Congleton of Saint Gobain. At Congleton's request, Hillman offered the position to Walden at a salary of $73,000 per annum and said that Saint Gobain needed him to start immediately. Walden told Hillman that he was uncomfortable resigning from his current position without giving advance notice to his employer, but Hillman said that if Walden insisted on providing the traditional two-weeks' notice, Saint Gobain would find someone else to fill the position.

Walden immediately tendered his resignation[3] and, on March 1, 2002, signed a Project Consultant Agreement ("Agreement") with Glotel. The Agreement provided that Walden would provide consulting services for Glotel's client, Saint Gobain. Paragraph 11, which governs termination of the Agreement, is significant for purposes of today's decision: "[Walden] understands and agrees that [Glotel] may terminate [Walden's] engagement at any time and for any rea-

son, with or without cause, and with or without notice."[4]

On Wednesday, March 6, 2002, Walden reported to Saint Gobain's offices for his first day of work wearing jeans and a flannel shirt over a white t-shirt. He worked that day, apparently without incident. That evening, Walden had planned to sleep at a friend's house but left in the middle of the night because the friend was having an argument with his girlfriend. At 2:00 a.m., Walden drove to Saint Gobain's offices, spoke briefly to a security guard, and then slept in his car for approximately four hours. At 6:00 a.m., Walden awoke and went inside to Saint Gobain's bathroom, washed his hands and face, wet his hair, and went back outside to smoke a cigarette.

Congleton arrived for work on Thursday morning at approximately 7:00 a.m. and encountered Walden. When Congleton remarked that Walden was early for work, Walden explained that he had slept in the parking lot. Congleton noticed that Walden was wearing the same jeans, flannel and t-shirt he had worn the previous day. He considered Walden's behavior "bizarre," and at some point told Walden "it would be more appropriate if [you] wore a button-down shirt and Dockers."[5]

Congleton called Hillman of Glotel to report that Walden had slept in the park-

---

**2.** Walden Dep. at 66, 73–74, 76–77.

**3.** Saint Gobain submitted an affidavit stating that Ajilon terminated Walden's employment involuntarily on March 5, 2002, allegedly for "excessive absenteeism." Def.'s Mot. Ex. 5, ¶ 10. Walden denies this allegation and contends that he resigned. Presented with Saint Gobain's Motion for Summary Judgment, the Court must accept Walden's contradictory version of events as true. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

**4.** Def.'s Mot. Ex. 3, ¶ 11.

**5.** Congleton Dep. at 22, 28. Saint Gobain's dress code in effect during March 2002 is attached to its Reply at Ex. 6. It provides examples of acceptable casual attire (*e.g.,* "Polo shirts," "Blouses," "Loafers," "Blazers and sport coats") and unacceptable casual attire (*e.g.,* "T-shirts and tank tops," "Jeans," "Sneakers," "Torn or distressed clothing"). There is no evidence that Walden received a copy of the written dress code. Although he could not recall the date of the conversation, Congleton testified unequivocally that he told Walden his dress was not in accordance with Saint Gobain's policy. Congleton Dep. at 12–13, 18, 22–24. Walden points to no evidence to dispute that this conversation occurred.

ing lot and that Walden was not conforming to Saint Gobain's business-casual dress code. He told Hillman that if Glotel could not get Walden to conform to Saint Gobain's dress code, Saint Gobain would not need him any longer. Walden worked at Saint Gobain on Friday, March 8, 2002, apparently without incident.

When Walden reported to Saint Gobain on Monday, March 11, 2002, Congleton told him that "based on you sleeping in the parking lot, . . . we don't think you're going to fit into our corporate culture," and that Saint Gobain was "looking for someone who wears Dockers." [6] Acting on instructions from a Saint Gobain manager, Congleton terminated Walden's assignment effective immediately. Walden then met with Hillman of Glotel to express his anger at being fired. Glotel paid Walden for the three days worked at Saint Gobain, plus an additional week's salary. Glotel had no other positions available for Walden, so their relationship terminated.

After receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission, Walden filed the instant action on August 14, 2003. The Complaint alleges race-based employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. Ann. § 951 *et seq.;* and common law causes of action for promissory estoppel and fraudulent misrepresentation. After Saint Gobain filed its Motion for Summary Judgment, Walden voluntarily agreed to withdraw his claim for fraudulent misrepresentation. Accordingly, judgment is entered in favor of Saint Gobain on that count.

## STANDARD OF REVIEW

■ The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense.[7] Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the nonmoving party.[8] The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial.[9] In employment discrimination cases, the summary judgment standard is "applied with added rigor" because "intent and credibility are crucial issues." [10]

## *DISCUSSION*

### A. **Walden's Employment Discrimination Claim**

■ Walden claims that Saint Gobain abruptly terminated him because of his race in violation of Title VII and the PHRA.[11] Although Saint Gobain attacks

---

**6.** Walden Dep. at 118.

**7.** *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

**8.** *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**9.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**10.** *Stewart v. Rutgers,* 120 F.3d 426, 431 (3d Cir.1997) (citation omitted).

**11.** Both Title VII and the PHRA make it unlawful for an employer to discharge an employee because of that employee's race. *See* 42 U.S.C. § 2000e–2(a)(1); 43 Pa. Stat. Ann. § 955(a). The legal analysis is identical for both statutes. *Burgh v. Borough Council of Borough of Montrose,* 251 F.3d 465, 469 (3d Cir.2001).

the viability of this claim because technically it was not Walden's employer, the Court assumes for purposes of analysis that Saint Gobain and Walden had the requisite employer-employee relationship under Title VII and the PHRA. For the reasons below, the Court agrees with Saint Gobain that Walden cannot adduce sufficient evidence to demonstrate that Saint Gobain terminated Walden's employment because of his race.

The familiar *McDonnell Douglas* burden shifting analysis applies to Walden's claims of employment discrimination.[12] Walden bears the initial burden of establishing a *prima facie* case of discrimination.[13] If he satisfies this burden, the burden shifts to Saint Gobain to articulate some legitimate, nondiscriminatory reason for terminating Walden.[14] If Saint Gobain can meet this burden, the presumption of discriminatory action raised by the *prima facie* case is rebutted.[15] To survive summary judgment, Walden then must present evidence that Saint Gobain's proffered reason was merely a pretext for discrimination and not the real motivation for his termination.[16] He may do so by providing evidence that would allow a factfinder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of [Saint Gobain's] action."[17]

■ The existence of a *prima facie* case of discrimination is a question of law for the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) either non-members of the plaintiff's protected class were treated more favorably, or the circumstances of the plaintiff's termination raise an inference of discrimination.[18] This test is flexible and must be tailored to fit the specific context of a given case.[19]

■ Saint Gobain argues that Walden cannot satisfy the fourth prong of the *prima facie* case. In response, Walden claims that the following evidence gives rise to an inference of racial discrimination. First, he contends that he was "treated differently and less-favorably than his fellow co-workers."[20] He notes that Saint Gobain maintains no work rules against sleeping in the parking lot before work or washing up in the office bathroom, and that it never terminated anyone for such conduct or for wearing improper attire. Second, he contends that Congleton made "[d]isparaging comments which reflected race-based animus towards Walden."[21] Specifically, Walden argues that Congleton's explanation for the termination—that Walden "did not fit into the

**12.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**13.** *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

**14.** *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

**15.** *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**16.** *Id.* at 253, 101 S.Ct. 1089.

**17.** *Sarullo v. United States Postal Serv.,* 352 F.3d 789, 800 (3d Cir.2003) (citations omitted), *cert. denied,* — U.S. —, 124 S.Ct. 2392, 158 L.Ed.2d 964 (2004).

**18.** *See id.* at 797; *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 318–19 (3d Cir.2000); *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 357 (3d Cir.1999).

**19.** *Sarullo,* 352 F.3d at 797–98.

**20.** Pl.'s Resp. at 6.

**21.** *Id.*

corporate culture" because, among other things, Saint Gobain wanted "someone who wears Dockers"—constitutes "direct evidence" of racial bias.

■ Even taking the evidence in the light most favorable to Walden, the circumstances of Walden's termination do not raise an inference of discrimination. Although Walden alleges disparate treatment, he fails to identify any similarly situated individuals or relate the circumstances of any other employees' treatment. This is a major and ultimately fatal deficiency in Walden's case.[22] While Walden notes that Saint Gobain has (admittedly) never fired any other individuals for wearing improper attire, washing up in the office bathroom, or spending part of the night in the office parking lot, this is not evidence that gives rise to an inference of racial discrimination. Presented in a vacuum and without reference to how Saint Gobain has treated any similarly situated, non-African-American employees that engaged in the same conduct, this set

of circumstances is not relevant to whether invidious discrimination—as opposed to an objection to Walden's conduct—motivated Saint Gobain's decision to discharge him. Nor is it significant that this specific conduct is not proscribed by a Saint Gobain work rule. As discussed in more detail *infra* at Part B, Walden was an "at-will" employee dischargeable "at any time and for any reason, with or without cause." Again, without evidence that similarly situated non-members of a protected class were treated more favorably, firing someone for conduct not specifically prohibited by a company handbook or work rule is not evidence of illegal employment discrimination. Given that Saint Gobain employed highly subjective criteria in deciding to terminate Walden, evidence of similarly situated employees is all the more imperative, and its absence is fatal to Walden's claim of disparate treatment.[23]

■ Nor can evidence of Congleton's allegedly disparaging comments save Walden's claim. This purported "direct evidence" of discriminatory animus is facially race-neutral.[24] No jury could rea-

**22.** *See, e.g., Tucker v. Merck & Co., Inc.,* No. Civ.A.03–5015, 2004 WL 1368823, at *12–13 (E.D.Pa. June 17, 2004) (concluding plaintiff could not establish *prima facie* case of race discrimination where he failed to identify any similarly *situated* non-members of the protected class who were treated more favorably); *Martin v. Enterprise Rent–a–Car,* No. Civ.A.00–CV–6029, 2003 WL 187432, at *5–6 (E.D.Pa. Jan.15, 2003) (same); *Ogden v. Keystone Residence,* 226 F.Supp.2d 588, 603 (M.D.Pa.2002) (same).

Saint Gobain seeks to rebut Walden's claim of disparate treatment with evidence that in January 2001 it hired (through Glotel) two white individuals to provide network engineering services. Saint Gobain terminated their employment because they left the premises without permission. These individuals are not helpful comparators, however, because they are not "similarly situated" with respect to Walden. To be "similarly situated," a comparator must "have engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." *Bullock v. Children's Hosp. of Philadelphia,* 71 F.Supp.2d 482, 489 (E.D.Pa.1999) (citations omitted). Saint Gobain's proffered comparators engaged in misconduct by "abandon[ing] their jobs." Hillman Dep. at 53 (counsel's description, affirmed by deponent). Although it employs colorful adjectives to describe Walden's behavior and attire, not even Saint Gobain accuses him of misconduct.

**23.** *See Anderson v. WBMG–42,* 253 F.3d 561, 564–65 (11th Cir.2001) ("When … no objective criteria was applied in an employer's decisionmaking process, such as here [where employee was fired for 'unprofessional behavior'], similarly situated evidence is particularly relevant because inferences of discriminatory motive depend upon the application of subjective criteria.").

**24.** Traditionally, "direct evidence" of discrimination is presented in the context of a *Price Waterhouse* mixed-motive theory of discrimination, and not, as in the instant case, in the

sonably conclude that Saint Gobain's stated preference for employees who "fit into a corporate culture" or dress in "Dockers" are statements "directly reflecting a discriminatory attitude." [25] The reference to "Dockers" relates to Saint Gobain's stated preference, as outlined in its dress code, that employees wear appropriate clothing to the office. The reference to Saint Gobain's "corporate culture" is more ambiguous, probably referring to more ineffable qualities and conduct associated with the professional and business communities. If Walden is suggesting that these terms are "codewords" for "non-African American," he presents no evidence in support of such an assertion.[26][27] Given the circumstances surrounding Walden's termination, no reasonable jury drawing on their common sense and experience would reach such a conclusion.[28]

Finally, it is also significant that Congleton is the same individual who both hired and fired Walden within a very short span

context of a pretext theory under *McDonnell Douglas*. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Walden's memorandum of law focuses only on a pretext theory and makes no mention of a mixed-motive theory. Of course, it is not incumbent upon Walden to elect to proceed under one of the two theories; instead, the Court must decide whether one or both theories properly apply to his claims. *Hankins v. City of Philadelphia*, 189 F.3d 353, 364 n. 6 (3d Cir.1999) (plaintiff's failure to present either pretext or mixed-motive arguments at summary judgment does not result in waiver); *Armbruster v. Unisys Corp.*, 32 F.3d 768, 782 n. 17 (3d Cir.1994). *But see Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir.2004) ("Inasmuch as Monaco attempted to prove his case solely through the use of indirect evidence, our analysis will focus on the burden shifting framework of *McDonnell Douglas* [and not on a *Price Waterhouse* analysis].…"). Although direct evidence of discrimination is no longer required to succeed on a mixed-motive theory, the plaintiff must still present "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race … was a motivating factor for any employment practice." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). As explained *infra*, Walden does not in fact have any "direct evidence" of discrimination, nor does he present any evidence from which a jury could reasonably discern even an *inference* that race was a motivating factor in his termination. Accordingly, the Court concludes that he cannot succeed on a mixed-motive theory.

**25.** *Hankins*, 189 F.3d at 364.

**26.** *See Snik v. Verizon Wireless*, No. Civ.A.03–CV–2976, 2004 WL 1151711, at *11 n. 6 (E.D.Pa. May 21, 2004) (concluding that the word "dynamic" is not a codeword for "young," and its use does not raise an inference of age discrimination). Although the *Snik* court cited a dictionary definition of "dynamic" in support of its reasoning, such an exercise in the case at bar would be needlessly pedantic to the point of being inane.

**27.** Walden also points to Congleton's statement that Walden was fired because Congleton "[f]elt it was no longer [his] responsibility to try to mold Mr. Walden into the candidate that we were looking for." Congleton Dep. at 38. Walden fails to explain the twist of logic that would transform this statement into one reflecting a discriminatory attitude. Surely, Walden does not suggest that Congleton was giving up his efforts to "mold" Walden into a person of a different race. The Court is at a complete loss as to how this statement supports Walden's case.

**28.** *Compare Hankins*, 189 F.3d at 365 (finding statement to an African American that a position was being reserved for the "gay, white community" constitutes "a quintessential example of direct evidence" of discrimination), *and Wilson v. Susquehanna Township Police Dep't*, 55 F.3d 126, 128, 130 (3d Cir.1995) (finding statement to woman applicant that supervisors "wanted a man" is direct evidence that gender played a role in decision-making), *with Satz v. Taipina*, No. Civ.A.01–5921, 2003 WL 22207205, at *19 (D.N.J. Apr.15, 2003) ("[N]o reasonable jury could find that Taipina's alleged use of the term 'wife beater' in the context of this case shows that he had a discriminatory animus against men.").

of time. Courts have concluded that this circumstance militates against any inference that discriminatory animus motivated an employment decision.[29] Accordingly, the Court concludes that Walden cannot establish a *prima facie* case of discrimination and that summary judgment in favor of Saint Gobain is appropriate.

**■■■■■** Even assuming that Walden could establish a *prima facie* case, his claim still cannot withstand summary judgment. Saint Gobain has articulated a legitimate, non-discriminatory reason for the termination, *i.e.,* that Walden's behavior was "bizarre" and did not conform to its "corporate culture," thus rebutting any presumption of discrimination. Accordingly, Walden must present evidence that would allow a reasonable factfinder either to disbelieve the employer's articulated legitimate reasons, or to believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of Saint Gobain's action.[30] In attempting to meet this burden, Walden relies exclusively on the evidence already discussed above. There is nothing inherently improper about relying on overlapping evidence in the *prima facie* and pretext stages of the *McDonnell Douglas* analysis,[31] but in this case Walden's failure to adduce any additional evidence that might either discredit Saint Gobain's ex-

planation or cast suspicion on its motivations further underscores the deficiency of his claim. Given the facts of this case, there is nothing outlandish about Congleton's assessment of Walden's conduct, nor is it incredible that Saint Gobain would use such conduct as a basis for termination. Accordingly, Walden's evidence fails to raise a genuine issue of material fact as to whether the reason for his termination was a pretext for race discrimination. For this additional reason, summary judgment is appropriate on Walden's employment discrimination claims.

**B. Walden's Promissory Estoppel Claim**

In support of his claim of promissory estoppel, Walden alleges that Saint Gobain promised him employment only if he would immediately resign from his position at the City of Philadelphia. He argues that Saint Gobain reasonably should have expected that its conditional offer would induce Walden to quit his job, move to the West Chester area, and start working at Saint Gobain. Because he relied on Saint Gobain's promise to his detriment, Walden contends, damages are due.[32]

As with Walden's employment discrimination claim, Saint Gobain moves for summary judgment on his promissory estoppel claim on the ground that Walden was em-

---

29. *See, e.g., James v. Allentown Bus. Sch.,* No. Civ.A.01–857, 2003 WL 21652189, at *11–12 (E.D.Pa. June 2, 2003) (finding "some evidence that Plaintiff's termination was not motivated by discriminatory animus" where the individual who terminated the plaintiff's employment was also involved in a decision to promote the plaintiff eighteen months earlier); *cf. Waldron v. SL Indus., Inc.,* 56 F.3d 491, 496 n. 6 (3d Cir.1995) ("[W]here ... the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination. But this is simply evidence like any

other and should not be accorded any presumptive value.").

30. *Sarullo,* 352 F.3d at 800.

31. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir.2000) ("As our cases have recognized ... evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.").

32. *See Crouse v. Cyclops Indus.,* 560 Pa. 394, 745 A.2d 606, 610 (2000) (outlining elements of promissory estoppel claim).

ployed by Glotel, not Saint Gobain. Because Walden's claim fails as a matter of law regardless, the Court will assume for purposes of analysis that Walden and Saint Gobain had an employee-employer relationship.

It is firmly established that Pennsylvania courts do not recognize a cause of action for promissory estoppel in the context of at-will employment.[33] Recognizing this barrier to his claim, Walden argues that he is entitled to an exception to the at-will doctrine because he gave "additional consideration" to Saint Gobain when they formed an employer-employee relationship, thus precluding his termination "without just cause for a reasonable time."[34]

In Pennsylvania, in the absence of an employment contract, an employment relationship is generally considered to be at-will, terminable by either party at any time and for any reason.[35] "However, an employee can defeat the 'at-will' presumption by establishing, *inter alia,* that the employee gave his employer additional consideration," which may include affording the employer "a substantial

benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform."[36] This ordinarily presents a jury question, but when the evidence is "so clear that no reasonable [person] would determine the issue before the court in any way but one," the issue may be resolved on summary judgment.[37]

In the instant case, the Court's analysis does not proceed from a mere "presumption" that Walden was an at-will employee; Walden specifically affirmed the at-will nature of his employment in the Agreement with Glotel. The Agreement states that "[Walden] understands and agrees that [Glotel] may terminate [Walden's] engagement at any time and for any reason, with or without cause, and with or without notice." The "additional consideration" theory of recovery is "an intention-discerning mechanism";[38] it provides an avenue for establishing the parties' intention that the employment relationship would *not* be terminable at-will. However, where the parties' intention regarding this specific issue is memorialized and agreed

---

**33.** *See Stumpp v. Stroudsburg Mun. Auth.,* 540 Pa. 391, 658 A.2d 333, 336 (1995) ("[E]quitable estoppel has been affirmatively rejected by this Court as an exception to the at-will rule."); *Holewinski v. Children's Hosp. of Pittsburgh,* 437 Pa.Super. 174, 649 A.2d 712, 714 (1994) ("In Pennsylvania, as a general rule, no common law cause of action exists against an employer for termination of an at-will employment relationship."); *see also Walsh v. Alarm Sec. Group, Inc.,* 230 F.Supp.2d 623, 630 (E.D.Pa.2002) ("Pennsylvania law simply does not recognize promissory or equitable estoppel as an exception to the at-will employment doctrine."), *rev'd on other grounds,* 95 Fed.Appx. 399 (3d Cir. Mar.24, 2004); *Satterfield v. Borough of Schuylkill Haven,* 12 F.Supp.2d 423, 441 (E.D.Pa.1998) ("Pennsylvania law clearly provides that the doctrine of equitable estoppel does not apply to at-will employment."); *Woomer v. Landis & Gyr, Inc.,* No. Civ.A.97–

2074, 1997 WL 256940, at *2 (E.D.Pa. May 1, 1997) ("Pennsylvania courts generally do not recognize a cause of action for detrimental reliance or estoppel as an exception to the employment at-will doctrine.").

**34.** *Veno v. Meredith,* 357 Pa.Super. 85, 515 A.2d 571, 580 (1986).

**35.** *Cashdollar v. Mercy Hosp. of Pittsburgh,* 406 Pa.Super. 606, 595 A.2d 70, 72 (1991).

**36.** *Id.* at 72–73 (citations omitted).

**37.** *Permenter v. Crown Cork & Seal Co., Inc.,* 38 F.Supp.2d 372, 379 (E.D.Pa.1999) (citations omitted), *aff'd,* 210 F.3d 358 (3d Cir. 2000) (Table).

**38.** *Scott v. Extracorporeal, Inc.,* 376 Pa.Super. 90, 545 A.2d 334, 340 (1998).

upon in an unambiguous written contract, as it is here, "the intent of the parties is to be ascertained from the document itself."[39] Therefore, even if Walden could establish that he provided Saint Gobain with additional consideration, the terms of the Agreement completely preclude him from establishing that his or Saint Gobain's conduct or statements evidence an intent to modify the at-will presumption.[40] None of the cases that Walden cites found that additional consideration warranted an exception to the at-will doctrine when terms of the employment contract defined the employment relationship as at-will.[41] By contrast, other courts from this district have found the existence of a specific agreement for at-will employment defeats any effort to supplant the at-will presumption.[42] The same reasoning applies here.

Accordingly, because Pennsylvania does not recognize a cause of action for promissory estoppel in the at-will employment context, Saint Gobain is entitled to summary judgment on Walden's claim for promissory estoppel. An appropriate Order follows.

### ORDER

**AND NOW,** this 30th day of June, 2004, upon consideration of Defendant Saint Gobain Corporation's Motion for Summary Judgment [Doc. # 14], Plaintiff's Response thereto, including his voluntary withdrawal of his fraudulent misrepresentation claim [Docs. # 18–19], Defendant's Reply [Doc. # 20], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED** in its entirety. It is further **ORDERED** that **JUDGMENT IS ENTERED** in favor of Defendant Saint Gobain Corporation and against Plaintiff Alfonso Walden on all counts of the Complaint.

It is further **ORDERED** that Plaintiff and Defendant Glotel, Inc. shall, within ten (10) days of the date of this Order, submit an update addressing the status of Plaintiff's claims against Defendant Glotel, Inc., including information relating to any arbitration between the parties.

It is so **ORDERED.**

39. *Kripp v. Kripp,* 849 A.2d 1159, 1162–63 (Pa.2004); *see also Sabad v. Fessenden,* 825 A.2d 682, 688 (Pa.Super.2003) ("When the words of a contract are clear and unambiguous, the intent of the parties is to be discovered from the express language of the agreement.") (citation omitted), *allo. denied,* 575 Pa. 697, 836 A.2d 122 (2003).

40. *See Darlington v. Gen. Elec.,* 350 Pa.Super. 183, 504 A.2d 306, 314 (1986) ("[I]f the parties specifically agreed that the employment would be at-will, even though additional consideration were present, we would expect a court to construe the contract according to the parties' stated intention and hold it to be at-will."), *overruled by implication on other* grounds, *Clay v. Advanced Computer Applications, Inc.,* 522 Pa. 86, 559 A.2d 917 (1989).

41. *See Walsh,* 230 F.Supp.2d 623; *News Printing Co., Inc. v. Roundy,* 409 Pa.Super. 64, 597 A.2d 662 (1991); *Cashdollar,* 595 A.2d 70.

42. *See, e.g., Permenter,* 38 F.Supp.2d at 379–80; *Sharp v. BW/IP Int'l Inc.,* 991 F.Supp. 451 (E.D.Pa.1998). *See also Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 661 (3d Cir.1990) (noting that plaintiff's signed agreement stating he was "employed at will" was "difficult to reconcile with his contention . . . that this was not an at-will employment").